FILED by _____ D.C.

**Aug 30, 2019**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

IN THE UNITED STATES DISTRICT COURT
FOR THE ~~Southern~~ DISTRICT OF FLORIDA
(Ft. Lauderdale) DIVISION

*(Write the District and Division, if any, of
the court in which the complaint is filed.)*

---

STEPHEN MARKS

_____

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against- 1. BROWARD SHERIFF'S OFFICE
2. SARGENT MICHAEL CATALANO
3. OFFICER ROBERTO ASPURY
4. FORMER SHERIFF ~~STEVE~~ SCOTT ISRAEL

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

---

19-62177-CV-ALTMAN/HUNT

**Complaint for Violation of Civil Rights**

(Non-Prisoner Complaint)

Case No. _____

*(to be filled in by the Clerk's Office)*

Jury Trial:  ☑ Yes  ☐ No

*(check one)*

---

NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting
from public access to electronic court files. Under this rule, papers filed with the court should
*not* contain: an individual's full social security number or full birth date; the full name of a
person known to be a minor; or a complete financial account number. A filing may include
*only*: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an
application to proceed in *forma pauperis*.

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | STEPHEN MARKS |
| Street Address | 9587 WELDON CIRCLE B104 |
| City and County | TAMARAC, FL 33321 BROWARD |
| State and Zip Code | FLORIDA 33321 |
| Telephone Number | (305) 900-7747 |
| E-mail Address | STEPHEN QMARKS @ GMAIL.COM |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | BROWARD SHERIFFS OFFICE |
| Job or Title (if known) | |
| Street Address | 2601 BROWARD BLVD |
| City and County | Ft. LAUDERDALE BROWARD |
| State and Zip Code | FLORIDA 33321 33312 |
| Telephone Number | (954) 765-4321 |
| E-mail Address (if known) | |

☐   Individual capacity        ☑   Official capacity

Defendant No. 2

| | |
|---|---|
| Name | MICHAEL CATALANO |
| Job or Title | SARGENT (BSO) |

(if known)

Street Address   2601 BROWARD BLVD (BSO)

City and County   FT. LAUDERDALE   BROWARD Co.

State and Zip Code   FLORIDA 33312

Telephone Number   (954) 765-4321

E-mail Address

(if known)

☑ Individual capacity          ☑ Official capacity

Defendant No. 3

Name   ROBERTO ASPURY

Job or Title   OFFICER   BSO

(if known)

Street Address   2601 BROWARD BLVD. (BSO)

City and County   FT. LAUDERDALE   BROWARD Co.

State and Zip Code   FLORIDA 33312

Telephone Number   (954) 765-4321

E-mail Address

(if known)

☑ Individual capacity          ☑ Official capacity

Defendant No. 4

Name   SCOTT STEVE ISRAEL

Job or Title   FORMER SHERIFF (BSO)

(if known)

Street Address   10731 SW 30th PL.

City and County   DAVIE FL. BROWARD

State and Zip Code   FLORIDA 33328

Telephone Number

E-mail Address

(if known)

☑ Individual capacity          ☑ Official capacity

## II.     Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.     Are you bringing suit against *(check all that apply)*:

☐ ☒ Federal officials (a *Bivens* claim)
☒ State or local officials (a § 1983 claim)

B.     Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983.  If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

_SEE ATTACHED_
_____
_____

C.     Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights.  If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

_____
_____
_____

D.     Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

_SEE ATTACHED_
_____
_____

III.   **Statement of Claim**

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?

9587 WELOON CIRCLE
ADT. B104
TAMARAC, FLORIDA 33321

B.   What date and approximate time did the events giving rise to your claim(s) occur?

AUGUST 30, 2017
12:00 NOON - 1:00 PM

C.   What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

SEE ATTACHED

## IV.  Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

PUNITIVE DAMAGES, PAIN AND SUFFERING
SEE ATTACHED

## V.  Relief

State briefly what you want the court to do for you.   Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

BROWARD SHERIFF'S OFFICE  $1 MILLION
SARGENT MICHAEL CATALANO  $ 500,006
OFFICER ROBERTO ASPURU  $ 500,000
FORMER SHERFF STEVE ISRAEL  $ 500,000

## VI.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.** **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _~~8-29~~ 8-30_ , 20 ~~__~~19

Signature of Plaintiff _____

Printed Name of Plaintiff _STEPHEN MARKS_____

**B.** **For Attorneys**

Date of signing: _____, 20__.

Signature of Attorney _____

Printed Name of Attorney _____
Bar Number _____
Name of Law Firm _____
Address _9587 WELON CIRCLE B104_
Telephone Number _TAMARAC FL 33321_
E-mail Address _(305) 900-7747_
EMAIL _STEPHEN MARKS @ GMAIL.COM_

7

**Section II. Basis for Jurisdiction**

**B and D Regarding Section 1983**

Plaintiff will prove from the BSO Video Webcams that defendants Sargent Catalano and Officer Aspuru were guilty of (section B) the *"deprivation of Plaintiff's rights, privileges, or immunities secured by the Constitution and federal laws"* and violated *"federal constitutional or statutory rights"* as *"state or local officials"* (Broward County Sheriff Officers).

These two officers (from Section D) also acted *"under color of any statute, ordinance, regulation, custom or usage of any state or Territory or the District of Columbia"* and also acted *"under color of state and local law."*

On August 30, 2017, Plaintiff's father Hyman Marks died in the condo he lived in with his wife Helen at 9587 Weldon Circle, Apartment B104, Tamarac, Florida 33321.  When Plaintiff arrived at the scene, he was denied entrance into the condo by Vitas Hospice, who were caring for his parents.  Vitas claimed that Stephen was not on the Power of Attorney for either his father Hyman or his mother Helen for medical issues (once Hyman died, his POA became moot).

This was either a lie or Vitas not knowing the truth, but either way, they were not correct as shown in Exhibit 1 (page 1 and page 6)of Hyman's POA) and Exhibit 2 (pages 1 and 7 of Helen's POA).  Both POAs show Plaintiff and his brother Lawrence as -co-POAs.  A third document called *"Health Care Surrogates"* (see Exhibit 2, page 1 of document) that also shows Plaintiff and his brother as having control over their parents' health issues.

Vitas also claimed (in another lie or incorrect information) the Plaintiff was not on the family trust for the condo, called the *"Hyman and Helen Marks Revocable Trust"*  (See exhibit 3, pages 1 and 5)  showing Stephen became a Trustee on the condo upon Hyman's death.

Because of this, Plaintiff was unable to see his father to say goodbye and make sure that his mother (suffering from Alzheimer's) was okay.  Vitas later apologized to Plaintiff for these mistakes.

<u>When Plaintiff was refused entry onto the property, he twice called 911, hoping a police officer would force Vitas to let him into the condo.  Instead both officers broke multiple laws in not allowing Stephen into the condo; threatening to arrest him if he didn't leave the premises.</u>

**Sargent Catalano went inside the property looking for paperwork to see if Stephen was indeed on the Trust, and found it.  See Exhibit 4, (the police webcam Video #4 of 5, from 11:54-1158), as well as Exhibit 5, a still show from that video showing Sargent Catalano looking directly the page of the Trust, and since he is looking only at the very top of the page, you will see that he HAD TO HAVE  clearly seen the name of Stephen Marks in huge letters as becoming a trustee upon his father's death.  This was physical proof that Plaintiff was telling the truth and was allowed on the property.**

**However, instead of allowing Stephen onto the property,  Sargent Catalano engaged in a corrupt cover-up and obstruction, ignoring the Trust, and then going outside and telling Plaintiff he couldn't find it (see exhibit 6, Video 5 of 5, 1:50) , then throwing Stephen off the property after telling him if he did not vacate the premises he would be arrested.**

Stephen had also called his attorney Larry Blacke (who had prepared the documents) to tell Sargent Catalano that Stephen was indeed on his parents' POAs and on the Trust.  At first the attorney could not be reached.  When plaintiff told Sargent Catalano he was going to call the attorney again, Catalano said he wasn't interested.

Office Aspuru, who arrived before Sargent Catalano also blindly took the side of Vitas over Plaintiff and also refused Plaintiff entry onto the property.  Not only was Stephen on the POAs and the Trust, he was also the employers of the Vitas employees, and was not given the right to fire them on the spot, a right he legally had.  The officers also allowed the Vitas workers join the officers in bullying Plaintiff, and not letting him on the property.

From the police webcam (See Exhibit7, video 2 of 5), the viewer will clearly see Officer Aspuru's belligerent and bullying behavior and actions towards Stephen when Stephen was trying to ask Nurse Morales of Vitas how his father died and she refused to give him a straight answer (Nurse Morales briefly came outside to speak with Plaintiff).  The webcam shows Officer Aspuru continuously provoking Stephen, trying to make Stephen do something stupid so he could arrest him, as the video shows, Officer Aspuru was clearly enjoying Plaintiff's anguish and his power over Plaintiff.   Plaintiff did briefly get to ask Nurse Ana Morales how and why his father died.  Morales kept dodging the question, and Officer Aspuru kept coaching Nurse Morales as to what she should say regarding Hyman's Marks' death, all lies, as you can see on the video.

Is this the job of a police officer to coach one party during a dispute when she is either lying or not giving straight answers to a grieving son who just found out that his father died?

**Summary of the worst things seen on the 5 police webcam videos: Key items bolded.  These videos can all be seen by going to YouTube.com and putting in the search term:  Marks' Lawsuit Docs.  The other material on this link is irrelevant to this lawsuit.**

Video 4: 19 minutes, 42 seconds

**2:05: Catalano comes outside and tells Plaintiff *"You're not on the trust.  Get off the property"***

**2:30: Catalano to someone on the police phone: "*He's (Plaintiff) not on the Power of Attorney*"**

**11:54: Looking through the paperwork inside the condo, Catalano sees Stephen's name on the Trust and lies: "*The Trust says nothing*".  Pure obstruction and cover-up.**

**1300: After seeing Stephen's name on the Trust, Catalano puts the document down and goes outside to tell Stephen he's NOT on the Trust.**

Video 5 of 5, right after the one above:  8 minutes, 26 seconds

**1:50: Catalano to Stephen: "*The bottom line is I can't find the paperwork.  I'm asking you to leave.*" A VICIOUS LIE AND MORE OBSTRUCTION**

2:40: Catalano to Stephen: "*I've done my part*" MORE OBSTRUCTION

Catalano to Stephen: "*You're impeding an investigation*" STEPHEN was impeding?

Catalano to Stephen: "*I've been a gentleman*."

4:40: Catalano to Stephen: "*I'm done with you*"

7:00: Catalano to Stephen: "*Last time, get off the property*."

Video 3, before the one above: 13 minutes and 45 seconds

0:40: Sargent Catalano to Stephen: "*I can throw you in jail.*,"

1:30 Catalano to Stephen: "*You've been acting irrational*".  From watching this video and the others, anyone can see that Stephen was the only person on the scene who was NOT irrational.

2:00: Catalano again accuses Stephen of having "*threatened*" people, another lie.

2:10 Catalano claims that his "dispatcher" heard Stephen making threats, another lie.

2:50: Catalano defends Vitas throwing Stephen off the property by saying "*It's a free country.*" What he is in effect saying it's a free country for Vitas and everyone else but Stephen.

3:05 Catalano to Stephen: "*I don't blame him*" defending Officer Aspuru's behavior towards Stephen.

Video 1: 2 minutes and 22 seconds long

0:55 Office Aspuru first enters the condo and both the Vitas employees and Officer Aspuru acknowledge they don't know who called him there, then Aspuru says it was maybe Stephen. This is very important because in Aspuru's "Incident Report" (see Exhibit 8), he lies and claims that he was called to the scene to investigate Hyman's death (cops are never routinely called to investigate a hospice death in a private residence), and also lies that Sargent Catalano was called to the scene because of Stephen's behavior.  Both are lies as both officers were called to the scene BY STEPHEN, hoping they would do the right thing and allow him on the premises.

Video 2: 4 minutes and 38 seconds long

2:30: Aspuru coaching Nurse Morales how to answer Stephen with lies about DNR, which was ridiculous since Plaintiff and Nurse Morales were discussing events when Hyman was still alive.

3:09 Aspuru absurdly accuses Stephen of "disturbing the peace"

3:20: When Morales won't give Stephen a straight answer, Aspuru says "They don't WANT to respond."

4:08: After Nurse Morales secretly mouths something to Aspuru (this is clearly seen on the video), Aspuru does what she asks and rudely "terminates" Plaintiff's conversation with Nurse Morales, saying "*we're done, we're coming in to prevent dealing with him.*" As you will clearly see in this video, Stephen did NOTHING to deserve having to not be "*dealt with,*" as he only repeatedly asked Nurse Morales to explain how his father died, and you will also see Nurse Morales does not give one straight answer to any of Plaintiff's questions. Office Aspuru then turns off his webcam at this point, not proper procedure since this was the most tense moment of the exchange.

As Officer Aspuru was provoking Stephen, Stephen called the Broward Sheriff's office again and asked for a superior office to come to the condo and remove Officer Aspuru and allow Stephen into the condo to see his dead father (which was his right) and to also try to get a straight answer out of Nurse Morales as to how and why his father died. That is when Sargent Catalano arrived at the scene. After Catalano was of no help, Plaintiff called the Sheriff Steve Israel. Israel did not take Plaintiff's call but his assistant did. The assistant was very sympathetic and promised the Sheriff would call Plaintiff back soon. He never did and when Plaintiff followed up the next day, he was told that the Sheriff "*stands by his men.*"

**Police Report (See Exhibit 8) Mentioned Above from Broward Sheriff's Office Written by Officer Apuru.  Considering that "*Filing a False Police Report*" is also a crime, this makes both officers guilty of criminal acts.  (Aspuru's words in italics, Plaintiff's responses in regular font)**

1. Most Outrageous Lie: **Aspuru claims Plaintiff was given "*counselling*" by the officers**. If you look through every second of the five videotapes, you will see that there is not one second of counselling, not even one "*I'm sorry for your loss.*" The officers never followed any proper procedure regarding how to deal with grieving relatives after a death.  Does officer Aspuru actually consider his enjoying (which you can see on the videos) his non-stop threats, bullying and belligerent behavior towards Stephen "COUNSELLING?"

*2.* From Aspuru: "*Note that upon arrival to the scene I also made contact with Stephen marks outside in the parking lot. It quickly became apparent that despite being distraught over his dad's passing, he was very irate and hostile towards myself and in particular, vitas staff on scene the staff included Chaplain Wilson ChuChu nurse aide Dorothy Hylton and nurse aide Joan Burgess. They all conveyed similar accounts to me that Stephen was threatening them and they were afraid.*"

Notice Officer Aspuru conveniently omits why Plaintiff was irate: BECAUSE HE WAS BEING DENIED ENTANCE INTO THE CONDO.

Also the flagrant lie that they were "*afraid*" of Plaintiff and "threatened" by him.  You can see this is a lie in the webcam (Video 1 of 5).  When Office Aspuru enters the condo, they all make

fun of Stephen, call him names, but NEVER once do the Vitas workers say they are afraid of him or that he made any threats.

That was just an excuse not to let him in the condo since they didn't want to answer his questions regarding his father's death that they refused to answer. After months of stonewalling, Vitas finally released their medical report for Hyman, showing that they did nothing in the last 9 days of his life when he was choking on phlegm (a minor thing) and begging to be taken to the ER which they did not do. Nor did they act in the spirit of Hospice to make his death comfortable, since their own records show Hyman died a horrible death screaming and gasping for air.

*3. From Aspuru: They also said his brother Larry Marks kas actual Power of Attorney overseeing his father Hyman and his wife who was present also, but very ill with advanced dementia. Vitas staff has been caring for the elderly couple around-the-clock and according to them, Stephen was not allowed inside the apartment due to previous incidences*

Again claiming that Plaintiff's brother Lawrence had POA and not Stephen was incorrect. And Stephen was not allowed inside do to "*previous incidents*?" WHAT *previous incidents*?

*3. From Aspuru: Stephen was a constant burden and hindrance to this investigation the entire time and scene. Despite repeated warnings and counseling he continuously displayed erratic and hostile behavior towards Vitas staff myself and sergeant Catalano on scene. He willingly left just prior to the funeral home's arrival on scene and no force or other actions were required despite his not still behavior*

First of all there was NO INVESTIGATION, as it was Stephen who called him in there, not anyone else calling him to investigate. This can again be proven by the webcam showing that when the officer arrived, they all agreed that they had no idea who called him in. Aspuru himself even said that maybe Stephen called.

Police are never routinely called to investigate deaths by hospice patients. He lies here to cover up the real reason why he was called there; to listen to Stephen's attempts to enter the condo and say goodbye to his father and make sure his mother was okay.

**Both Sargent Catalano and Officer Aspuru committed multiple criminal acts at the scene; Sargent Catalano committing criminal acts when he covered-up the Trust showing Plaintiff was right and the officers and Vitas were wrong about Plaintiff being on the Trust; and Officer Aspuru submitting a False Police Report. From the videotapes we can see that the officers grossly trampled on Plaintiff's civil rights, and caused Plaintiff severe emotional anguish, making them responsible for actual and punitive damages. Plaintiff to this day has not been able to grieve properly over the death of his father, nor was he able to say goodbye to his father that day or make sure that his mother was safe and emotionally stable.**

The job of police officers is to protect and serve the public, NOT to use their considerable power to deliberately and maliciously inflict emotional trauma on innocent citizens who have just experienced the death of a parent for the first time, and actually enjoy that citizen's pain and anguish.

These acts are easily provable, so if Plaintiff does not get a satisfactory response from this complaint, all the damning videos and the false police report will be passed along to the proper local and federal authorities who investigate criminal acts.  This would include the local Broward County Prosecutor, the Federal US Attorney, the State Attorney General, the BSO Internal Affairs Department and the media.

All inquiries and communications to Plaintiff should be made either through the court or to Thomas Madden of Transmedia PR Group, Boca Raton, Florida, at 561-750-9800, Ext. 2100.

_EXHIBIT 1_

TRUE & CORRECT COPY,

_Taylored_

LAWRENCE E. BLACKE, ESQ.

## DURABLE POWER OF ATTORNEY

I, **Hyman Marks**, with an address of 9587 Weldon Circle, Tamarac, Fl. 33321, make, constitute and nominate my sons **Stephen Marks** and **Lawrence Bruce Marks** as my agents. *Either of my agents shall have the full authority to act on my behalf without the consent or joinder of the other.*

In the event that either of my Co-Agents is unable or unwilling to serve, the remaining agent shall have all of the authority given hereunder below.

## ARTICLE I

I hereby give and grant unto my said Co-agents full power and authority to act for me in any lawful way with respect to the powers enumerated in Article II, and to the powers which I have separately enumerated and initialed in Article III.

## ARTICLE II

My agent is authorized to act for me in my name, place and stead and may exercise any or all of the powers contained in this Article II.

**2.1**  **Banking and Other Financial Institution Transactions.**  With regard to banking and other financial institution transactions, my agent shall have the authority to conduct banking transactions as provided in section 709.2208(1), Florida Statutes.

**2.2**  **Investment Transactions.**  With regard to stock and bond transactions, my agent shall have the authority to conduct investment transactions as provided in section 709.2208(2), Florida Statutes.

**2.3**  **Real Property Transactions.**  With regard to real property transactions, my agent may exercise all of the following powers with regard to any real property I own, specifically including, but not limited to, my homestead property, leaseholds, mortgages, contracts, and mineral rights: (1) convey or mortgage real property; (2) accept as a gift or as security for a loan or reject, demand, buy, lease, receive, or otherwise acquire an interest in real property or a right incident to real property; (3) sell, exchange, convey with or without covenants, quitclaim, release, surrender, mortgage, encumber, partition, consent to partitioning, subdivide, apply for zoning, rezoning, or other governmental permits, plat or consent to platting, develop, grant options concerning, lease or sublet, or otherwise dispose of an estate or interest in real property or a right incident to real property; (4) release, assign, satisfy, and enforce by litigation, action, or otherwise a mortgage, deed of trust, encumbrance, lien, or other claim to real property that exists or is claimed to exist; (5) do any act of management or of conservation with respect to an interest in real property, or a right incident to real property, owned or claimed to be owned by me, including power to insure against a casualty, liability, or loss; obtain or regain possession or protect the interest or right by litigation, action, or otherwise; pay,

Page 1 of 12

years following that tax year; (2) pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority; (3) exercise any election available to me under federal, state, local, or foreign tax law; (4) act for me in all tax matters for all periods before the Internal Revenue Service and any other taxing authority; and (5) represent me, and appoint an agent or agents to represent me, before the Internal Revenue Service or any State or other taxing authority by completing, signing, and submitting IRS Form 2848 or any other governmental form.

**1.13** **Existing and Foreign Interests.** The powers described in Article II of this durable power of attorney may be exercised equally with respect to an interest I have at the time this durable power of attorney is executed or an interest which I acquire later, whether or not the interest is located in Florida and whether or not the powers are exercised or the durable power of attorney is executed in Florida.

**1.14** **Health Records and Information.** With regard to obtaining records related to my health, my agent has the authority to:

(1)   Request, review, and receive any information, verbal or written, regarding my physical or mental health, including medical and hospital records.

(2)   Execute on my behalf any documents that may be required in order to obtain this information.

(3)   Consent to the disclosure of this information.

This release authority applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 (a/k/a HIPAA), 42 USC 1320d and 45 CFR 160-164.   I authorize any physician, health-care professional, dentist, health plan, hospital, clinic, laboratory, pharmacy or other covered health care provider, any insurance company and the Medical Information Bureau Inc. or other health-care clearinghouse that has provided treatment or services to me, or that has paid for or is seeking payment from me for such services, to give, disclose and release to my agent, without restriction, all of my individually-identifiable health information and medical records regarding any past, present or future medical or mental health condition, including all information relating to the diagnosis and treatment of HIV/AIDS, sexually-transmitted diseases, mental illness, and drug or alcohol abuse. The authority given my agents shall supersede any prior agreement that I may have made with my health-care providers to restrict access to or disclosure of my individually-identifiable health information.   The authority given my agent has no expiration date and shall expire only in the event that I revoke the authority in writing and deliver it to my health-care provider.

**2.15** **Provide for My Care.** With regard to health care decisions, my agent shall have the authority to make any and all health care decisions on my behalf, including but not limited to those provided for in Florida Statutes Chapter 765. *If I have executed a separate health care advance directive designation and health care surrogate pursuant to Chapter 765 of the Florida Statutes, the terms of the directive will control if its terms are in conflict with the terms of this document.*

_Exhibit 8_

## DURABLE POWER OF ATTORNEY

I, **HELEN MARKS** , with an address of 9587 Weldon Circle, Tamarac, Fl. 33321, make, constitute and nominate my sons Stephen Marks and Lawrence Bruce Marks as my agents.
*Either of my agents shall have the full authority to act on my behalf without the consent or joinder of the other.*

In the event that either of my Co-Agents is unable or unwilling to serve, the remaining agent shall have all of the authority given hereunder below.

## ARTICLE I

I hereby give and grant unto my said Co-agents full power and authority to act for me in any lawful way with respect to the powers enumerated in Article II, and to the powers which I have separately enumerated and initialed in Article III.

## ARTICLE II

My agent is authorized to act for me in my name, place and stead and may exercise any or all of the powers contained in this Article II.

**2.1    Banking and Other Financial Institution Transactions.** With regard to banking and other financial institution transactions, my agent shall have the authority to conduct banking transactions as provided in section 709.2208(1), Florida Statutes.

**2.2    Investment Transactions.** With regard to stock and bond transactions, my agent shall have the authority to conduct investment transactions as provided in section 709.2208(2), Florida Statutes.

**2.3    Real Property Transactions.** With regard to real property transactions, my agent may exercise all of the following powers with regard to any real property I own, specifically including, but not limited to, my homestead property, leaseholds, mortgages, contracts, and mineral rights: (1) convey or mortgage real property; (2) accept as a gift or as security for a loan or reject, demand, buy, lease, receive, or otherwise acquire an interest in real property or a right incident to real property; (3) sell, exchange, convey with or without covenants, quitclaim, release, surrender, mortgage, encumber, partition, consent to partitioning, subdivide, apply for zoning, rezoning, or other governmental permits, plat or consent to platting, develop, grant options concerning, lease or sublet, or otherwise dispose of an estate or interest in real property or a right incident to real property; (4) release, assign, satisfy, and enforce by litigation, action, or otherwise a mortgage, deed of trust, encumbrance, lien, or other claim to real property that exists or is claimed to exist; (5) do any act of management or of conservation with respect to an interest in real property, or a right incident to real property, owned or claimed to be owned by me, including power to insure against a casualty, liability, or loss; obtain or regain possession or protect the interest or right by litigation, action, or otherwise; pay, compromise, or contest taxes or assessments or apply for and receive refunds in connection with them; and purchase supplies, hire assistance or labor, or make repairs or alterations in the real

Page 1 of 12

authority given my agent has no expiration date and shall expire only in the event that I revoke the authority in writing and deliver it to my health-care provider.

    **2.15**    **Provide for My Care.** With regard to health care decisions, my agent shall have the authority to make any and all health care decisions on my behalf, including but not limited to those provided for in Florida Statutes Chapter 765. *If I have executed a separate health care advance directive designation and health care surrogate pursuant to Chapter 765 of the Florida Statutes, the terms of the directive will control if its terms are in conflict with the terms of this document.*

### ARTICLE III

    My agent is authorized to perform the following specific acts for me:

**Initial:**

YES (✓   )   **Power to Enter Safe Deposit Box.** I grant to my agent the power to enter my
NO(     )  safe deposit box.

YES(     )   **Power to Make Gifts to Descendants Under the Annual Exclusion.** I grant to
NO (     )  my agent the power to make gifts of any of my property to or to pay amounts on behalf of (including transfers which are made outright, in trust or otherwise) any one or more of my descendants (including my agent, if my agent is a descendant of mine) or to any charitable organization to which deductible gifts may be made under the income and gift tax provisions of the Code. Such gifts or amounts paid to my descendants may not exceed those which are excludible under Section 2503(b) or Section 2503(e) of the Code or those to which the split gift provisions of Section 2513 of the Code are expected to apply. **(OR, SUCH GIFTS OR AMOUNTS PAID TO MY DESCENDANTS SHALL INCLUDE, AND MAY EXCEED, THOSE WHICH ARE EXCLUDIBLE UNDER SECTION 2503(B) OR SECTION 2503(E) OF THE CODE OR THOSE TO WHICH THE SPLIT GIFT PROVISIONS OF SECTION 2513 OF THE CODE ARE EXPECTED TO APPLY.)** Nothing herein shall be construed to require any court action whatsoever prior to making such gifts, nor to restrict such gifts to a situation in which it must be determined that I will remain incapacitated for the remainder of my lifetime. Notwithstanding the foregoing, the gifts made by a person who is then serving as my agent under this durable power of attorney to him/herself shall either be made solely for his/her health, education, maintenance and support or shall not exceed in the aggregate for any calendar year the greater of five thousand dollars ($5,000) or five percent (5%) of the fair market value of my estate (for U.S. gift tax purposes) as of December 31st of such calendar year; provided, however, if my agent is making gifts authorized by the following paragraph of this durable power of attorney in order to obtain or maintain eligibility for public health care benefits, then these limitations shall not apply.

Page 7 of 12

## DESIGNATION OF HEALTH CARE SURROGATE

I, **HYMAN MARKS**, a resident of Broward County, Florida, state that in the event that I am determined to be unable or incapacitated to provide informed consent for medical treatment and surgical and diagnostic procedures, I wish to designate my sons **Lawrence Bruce Marks** and **Stephen Marks** as my Co-surrogates to make health care decisions.

**I.    DESIGNATION**:

Name:   **Lawrence Bruce Marks**
Address:

Name : **Stephen Marks**
Address:

**II.    SCOPE OF SURROGATE'S AUTHORITY:** In exercising this authority my surrogate(s) shall follow my desires as set forth in this document or in a medical advance directive, or as may be otherwise known to the surrogate. I fully understand that this designation will permit my designee to exercise the following authority:

a. To act for me and to make all health care decisions for me in matters regarding my health care during my incapacity, in accordance with my instructions, unless I have expressly limited such authority;

b. To act for me and to make all mental health care decisions for me in matters regarding my mental health care for both in-patient hospital care and out-patient hospital care in the event I am in need of treatment and am unable to seek assistance myself due to incapacity or inability to recognize the need for treatment.

c. To consult expeditiously with appropriate health care providers to provide informed consent, and make only health care decisions for me which he or she believes I would have made under the circumstances if I were capable of making such decisions. If there is no indication of what the principal would have chosen, the surrogate may consider the patient's best interest in deciding that proposed treatments are to be withheld or that treatments currently in effect are to be withdrawn.

d. To provide, withhold or withdraw written consent on my behalf whenever consent or withdrawal thereof is required as it relates to medical care, treatment, surgical procedure, diagnostic procedure, medication. As to providing or withholding consent as to the use of mechanical or artificial means to replace or support a bodily function, my surrogate is to be guided by instructions in my living will and medical advance directive;

e. To request and be provided with access to my clinical records, whether privileged or confidential, including medical and mental health records. My surrogate may execute any written release or consent that may be required in order to obtain such information;

EXHIBIT 3

# THE HYMAN and HELEN MARKS REVOCABLE TRUST

## DATED October 15, 2016

THE HYMAN and HELEN MARKS REVOCABLE TRUST Dated October 15, 2016. Page 5

## ARTICLE III
## ADMINISTRATION & DISTRIBUTION DURING THE LIFE OF THE GRANTORS

**(A)     ORDER OF SUCCESSION**: The Trustee of this Trust shall be **HYMAN MARKS**. If **HYMAN MARKS** cannot continue to serve due to death, resignation or incapacity, the Successor Co- Trustees shall be **LAWRENCE BRUCE MARKS  and STEPHEN MARKS**.

If either of the Successor Co-Trustees cannot serve for any reason, the remaining Co-Trustees shall continue to act and serve as successor Trustee with full authority hereunder.

If two or more Trustees are serving at any time, any power or discretion of the Trustees may be exercised only by their joint agreement. Either Trustee may delegate to the other Trustee the authority to act on behalf of both Trustees and to exercise any power held by the Trustees. If more than two Trustees are serving at any time, and unless unanimous agreement is specifically required by the terms of this Trust, any power or discretion of the Trustees may be exercised only by a majority. The Trustees may delegate to any one or more of themselves the authority to act on behalf of all the Trustees and to exercise any power held by the Trustees. Trustees who consent to the delegation of authority to other Trustees will be liable for the consequences of the actions of those other Trustees as if the consenting Trustees had joined the other Trustees in performing those actions. A dissenting Trustee who did not consent to the delegation of authority to another Trustee and who has not joined in the exercise of a power or discretion cannot be held liable for the consequences of the exercise. A dissenting Trustee who joins only at the direction of the majority will not be liable for the consequences of the exercise if the dissent is expressed in writing delivered to any of the other Trustees before the exercise of that power or discretion.

**(B)     TRUSTEES MAY SIGN**: During such time as the initial Trustees are acting under this Article, the Trustees alone shall have the sole power to buy, sell, hold, or transfer any asset in this Trust by executing any appropriate document, whether it be a deed, bill of sale, contract, stock or bond certificate or power, option, lease note or mortgage, or by an oral demand to buy or sell a stock or bond. Further, the Trustees shall have the right and power to make any deposits and withdrawals from any bank, brokerage, or mutual fund account of the Trust, and any bank, broker, or mutual fund holding such account may accept the Trustee's signature on any check.

**(C)     DISPOSITION OF INCOME AND PRINCIPAL**: During the GRANTOR'S lifetime, the Trustees shall pay all of the net income of the Trust currently in convenient installments, at least annually to the GRANTORS or as the GRANTORS otherwise directs in writing and the Trustees shall, from time to time, upon written direction by the GRANTORS, pay any part or all of the principal to the GRANTORS or as the GRANTORS otherwise  directs.

**(D)     USE OF TRUST ASSETS DURING DISABILITY OR INCAPACITY OF THE GRANTORS**: If at any time or times GRANTORS is under a legal disability or is unable properly to manage GRANTOR'S own affairs, Trustees may use such sums from the income and principal of

EXHIBIT 5

EXHIBITS
4 & 6
are on
the VIDEO

## REPORTING OFFICER NARRATIVE

*Broward County Sheriff's Office*

| Victim | Offense | OCA |
| --- | --- | --- |
| | | 07-1708-003114 |
| *MARKS, HYMAN* | *DEATH INVESTIGATION* | Date / Time Reported |
| | | *Wed 08/30/2017 12:43* |

On August 30th, 2017 at 1243 hours, I responded to an Attended Hospice Death by VITAS at 9587 Weldon Circle #104,Tamarac, Fl. On arrival I met with VITAS RN Anna Morales and observed the deceased patient Hyman Marks 1/18/25 lying unresponsive in his bed. RN Morales said Hyman had several serious medical afflictions including a recent heart condition which required a Pacemaker and he was Terminally ill. RN Morales said Hyman has a DNR on file and I saw it was posted by Dr Nierhala Rattan-Washington from VITAS. Morales stated Hyman appeared to have had a fatal medical episode sometime shortly before my arrival and RN Morales Pronounced him Deceased at 1222 hours. I made contact with VITAS Doctor Washington who was willing to sign the Death Certificate, as well as Broward Medical Examainer Dr Rangel who was informed of the death and Refused Jurisdiction. Star Of David was contacted for final arrangements and removed the body at 1534 hours, per previous arrangements made by VITAS and next of kin Larry Marks.

Note that upon arrival to the scene, I also made contact with Stephen Marks outside in the parking lot. It quickly became apparent that despite being distraught over his dad's passing, he was very irate and hostile towards myself and in particular, VITAS staff on scene. The staff included Chaplain Wilson ChuChu, Nurse Aide Dorothy Hylton and Nurse Aide Joan Burgess. They all conveyed similar accounts to me that Stephen was threatening them and they were afraid. They also said his brother Larry Marks has the actual Power Of attorney overseeing his father Hyman and his wife who was present also, but very ill with advanced Dimentia. VITAS staff has been caring for the elderly couple around the clock and according to them, Stephen is not allowed inside the apartment due to previous incidents.

Stephen was a constant burden and hindrance to this investigation the entire time on scene. Despite repeated warnings and counselling, he continuously displayed erratic and hostile behavior towards VITAS staff, myself, and Sgt Catalano on scene. He left willingly just prior to the funeral home's arrival on scene and no force or other actions were required despite his hostile behavior.

---

Reporting Officer:*ASPURU, R F.*          Printed By  BS18168_REC_33   10/16/2017 18 08                    Page 4